UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA for the use and benefit of WELLS CARGO, INC., | Case No. 2:18-cv-01182-JCM-EJY |
|---|---|
| Plaintiff(s), | ORDER |
| v. | |
| ALPHA ENERGY AND ELECTRIC, INC., | |
| Defendant(s). | |

Presently before the court is the matter of *United States for the Use and Benefit of Wells Cargo v. Alpha Energy and Electric et al.* This court conducted a two-day bench trial on this matter beginning on October 31, 2022.

Considering the evidence adduced at trial, the court makes the following findings and conclusions. Any and all findings of fact set forth herein shall constitute findings of fact even if stated as conclusions of law, and any and all conclusions of law set forth herein constitute conclusions of law even if stated as findings of fact.

Consistent with those findings, the court hereby rules in favor of Alpha Energy and Electric, Inc. ("Alpha") and American Contractors Indemnity Company ("ACIC") on all claims, and it adopts Alpha's proposed findings of fact and conclusions of law insofar as they appear below.

**FINDINGS OF FACT**

1. In August 2016, Alpha and Northcon, Inc. ("Northcon") executed a Teaming Agreement (Tr. Ex. 1) to jointly pursue government construction contracts designated as "set aside" projects for qualifying contractors like Alpha.

2. To qualify for these projects, the Teaming Agreement identified Alpha as the "Prime Contractor" and Northcon as the "Subcontractor" because Alpha was eligible to bid on set aside projects and Northcon was not.

3. The Teaming Agreement was prepared by Northcon, and because Northcon had more experience than Alpha in government construction projects, Northcon took the lead in preparing contract bids and cost estimates for all projects pursued under that Agreement.

4. Under the Teaming Agreement, Alpha and Northcon submitted a bid for the FamCamp project at Nellis Air Force Base.

5. The government awarded the contract to Alpha in August 2016.

6. The government approved the base bid and exercised the second option for added pavement to drive lanes. The government declined to exercise the first option for construction of an outer loop road. (Tr. Ex. 502)

7. The total amount of the awarded contract with the base bid ($4,714,700) and the second option ($15,650) was $4,703,350.

8. To comply with federal law, Alpha secured a payment bond issued by ACIC on the contract in the amount of $4,703,350.

9. In April 2017, Northcon sent Alpha a subcontract for the FamCamp project that set forth both the scope of Northcon's work as a subcontractor on the project and the price to be paid in Attachment A. (Tr. Ex. 20).

10. The subcontract was not signed, but the parties do not dispute that they operated under the subcontract and considered it a binding agreement.

11. The subcontract stated that Northcon would "[p]rovide all electrical and communication construction of the Addition/alteration of the Family camp Ground at Nellis AFB NV, includ[ing] all material, labor and supervision as required by Alpha"; "[p]rovide miscellaneous

materials for concrete installation, gravels, plumbing, water and sewer lines"; and "[p]rovide the pre-engineered building kits." (Tr. Ex. 20 at 14)

12. The subcontract set a fixed price of $1,848,964.54. (*Id.*) Northcon directly performed some of its scope of work under the subcontract and completed work through subcontractors.

13. The Alpha-Northcon subcontract also included the following provisions:

> [1.1] . . . In accordance with Attachment A, [Alpha] shall perform 50% of the costs of the Prime Contract incurred for personnel with its own employees, and [Northcon] shall perform no more than 50% of the costs of the Prime Contract incurred for personnel with its own employees (the "Agreed Division of Services").
>
> 4.1 Compensation and Budget. [Northcon] agrees to perform services under this Subcontract in accordance with the rates/prices delineated in Attachment A hereto, and as requested by [Alpha] or its authorized representatives. . . . [U]nless this Subcontract is modified with mutual consent of both parties hereto, such costs shall not, in total, and when applicable, exceed any ceiling amount noted in Attachment A hereto.
>
> 4.2 Audit and Allowability of Costs. . . . In the event the Government Contracting Officer or any other Government official disallows any costs related to payments made by [Alpha] to [Northcon] which are attributable to work performed or costs claimed by [Northcon] under this Subcontract, whether direct or indirect, then such related payments shall be immediately refunded to [Alpha] by [Northcon].
>
> 4.4 Invoice and Payment Procedure. [Northcon] shall prepare and submit all invoices to [Alpha]. [Alpha] shall pay [Northcon] within fourteen (14) calendar days of [Alpha's] receipt from the Government for Billed Subcontract charges.
>
> 5.2 [U]pon receipt and approval of the invoice or voucher designated by [Northcon] as the "Final Invoice" and upon compliance by [Northcon] with all of the provisions of this Subcontract including closeout procedures, [Alpha] shall pay any balance, including retentions, which has not been paid to [Northcon]. . . . [T]he Final Invoice shall be submitted by [Northcon] promptly following completion of the work under this Subcontract but in no event later than ten (10) business days (or longer period as [Alpha] may in its discretion approve in writing) from the date of such completion.
>
> 15.2 [Northcon's] personnel performing services under this Subcontract shall at all times be employees of [Northcon] and not employees of [Alpha]. [Northcon] shall pay all wages, salaries, and other amounts due its employees in connection with this Subcontract . . . .
>
> 20.5 Each party acknowledges: (i) the risks of its undertakings; (ii) the uncertainty of the benefits and obligations; and (iii) its assumptions of such risks and uncertainties. Each party has conducted its own due diligence and requested and reviewed any contracts, business plans, financial documents, and other written material as in such party's opinion shall be the basis of that party's decision to enter into this Subcontract. . . . Each party represents and warrants that it has read, knows, understands, and agrees with the terms and conditions of this Subcontract.
>
> 28.3 Amendments and Waivers. This Subcontract may not be modified or amended except in writing, signed by both parties. Either party hereto may, by an instrument

3

>in writing, waive compliance by the other party with any term of provision of this Subcontract on the part of such other party.

(Tr. Ex. 20).

14. The written protocols for the FamCamp project called for Northcon to perform all administrative services and for both parties to perform and bill direct labor costs on the project. (Tr. Ex. 19). Alpha was required to prepare and submit payroll records to Northcon for self-performed work. (*Id.*)

15. Alpha satisfied its self-performance requirement for direct labor on the project, and at no time during the project did Northcon or the government ever indicate differently.

16. Northcon's position that it paid for concrete labor that was supposed to belong entirely to Alpha is not credible. At the beginning of work on the project in April 2017, Okafor emailed Northcon CFO Erik Panke about Northcon's scope of work that Okafor understood to include "concrete installation." (Tr. Ex. 558). Panke responded to this email but did not dispute Okafor's statement that Northcon's scope of work included concrete labor. This refutes Northcon's position that a different scope of work was orally agreed to in a pre-project meeting.

17. Northcon's billing practices during the project also confirmed Okafor's understanding of the division of work. Panke admitted that Northcon routinely billed labor costs that it now claims were Alpha's responsibility against its own contract price without ever issuing change orders to Alpha, advising Alpha that the labor costs were outside its purported scope of work, or requesting to increase the contract ceiling price. (*See*, e.g., Tr. Exs. 557 (administration labor) and 528–529 (concrete labor)).

18. Okafor credibly testified that he understood Northcon to have responsibility for part of the direct cost of labor on the project because of the agreed division of services in Section 1.1 of the subcontract (Tr. Ex. 20), the protocols created by Northcon calling for it to cover direct labor costs (Tr. Ex. 19), and the lack of contradiction from Panke to Okafor's email describing Northcon's responsibility for "concrete installation" (Tr. Ex. 558).

19. The court does not find Northcon's schedule of values to be persuasive evidence disproving Okafor's testimony. That document (Tr. Ex. 22 at 3) reflects an incorrect price of the prime contract that improperly includes the outer loop road option not exercised by the

4

government and includes two line-item amounts for Northcon work (slurry and masonry) that have no corresponding value under the prime contract (i.e., they appear to be outside the contract the government issued for the FamCamp project). The document is sloppy at best, and, more importantly, there is no evidence in the record that Okafor concurred with the price breakdown. And, as shown in the testimony of Erik Panke discussed above, the suggestion in the document that Northcon had no responsibility for labor costs under its base contract price is contradicted by Northcon's own billing practices that repeatedly charged those costs against the base contract price without objection.

20. The court also is not persuaded by the argument that Alpha directed Northcon to perform work outside the subcontract by refusing to take non-HUBZone employees onto its payroll. Okafor credibly testified that the purpose of his communications on the subject were to stress the importance of hiring HUBZone qualified workers to maintain proper HUBZone certification, which was mutually beneficial to Alpha and Northcon. The emails are logically read as direction from Okafor for Northcon to hire HUBZone employees on the project, not for Northcon to hire and pay outside the contract for non-HUBZone employees. Northcon General Manager of Operations Jack Daniels echoed the importance of complying with HUBZone requirements by hiring qualified workers on the project.

21. The HUBZone emails also show that Northcon stopped asking Alpha about hiring non-HUBZone employees in mid-August 2017; even if those earlier emails could be considered "directives" from Alpha for Northcon to take on extra labor costs, those directives are isolated and limited to discrete portions of the project before labor costs caused significant overruns.

22. Nothing in the emails indicates that Alpha agreed to the arrangement Northcon now claims on paying for concrete labor and other labor costs; and the record does not indicate that Northcon allowed Alpha to make an informed decision on the issue as the project progressed. Instead, the evidence shows that Northcon waited until the project was substantially complete to inform Alpha of cost overruns that Northcon had known about for months and was now using to seek payment of extra sums totaling hundreds of thousands of dollars. Okafor's testimony on this is supported by a contemporaneous email he sent to Panke that has no rebuttal. (Tr. Ex. 47).

5

23. Northcon employee Ellard Comstock was designated as the project manager for the FamCamp project. At the outset, Northcon provided Alpha a draft designation of authority letter for Mr. Comstock that Alpha President Gabriel Okafor signed and returned. The letter states:

> Mr. Comstock,
>
> This letter serves as your designation of authority to perform the role of Project General Manager, including the authority to negotiate task orders and have signing authority, pursuant to corporate and my review, for any contractual matters that are specific to the FAMCAMP [project].

(Tr. Ex. 524).

24. The credible testimony at trial shows that Comstock failed to provide any change order to Okafor for review and approval. Instead, Comstock admitted that he acted as a "cowboy" in performing his job duties without following the contract requirements for written change orders or the express limitation on this authority as project manager.

25. The court agrees with Okafor that it was essential for Comstock to comply with those requirements on this project to ensure that parties were clear on what was being done and who would be paying for work.

26. The limitations on Comstock's authority also were critical to ensure he did not engage in self-dealing by offering extra work to Northcon (his employer) or other subcontractors for whom he performed side jobs and received money personally.

27. Separate designations of authority were given to Northcon employee Chris Veltema to serve as both the Quality Control Manager and Site Safety Officer on the project. (Tr. Ex. 524)

28. Despite the intent of the parties to consolidate these functions, the evidence at trial (Tr. Ex. 557) and the testimony of Erik Panke shows that Northcon billed separately for two full time employees in each position and now seeks the full amount of that billing as damages.

29. Panke's testimony on the same document also shows Northcon was double-billing for two full-time Quality Control Managers on the project in January and February 2017 (Veltema and Jim Downing) even though Comstock testified that the project required only one manager and there should have been no overlap between those employees in that position.

30. Starting in March 2017, Northcon issued monthly invoices to Alpha for work on the FamCamp project under its subcontract. (Tr. Exs. 536-555).

6

31. Between March and September 2017, Northcon issued invoices to Alpha totaling $1,587,339.26 (Tr. Exs. 537-544), which Alpha paid in full.

32. In June 2017, Alpha also made a distribution payment to Northcon in the amount of $73,500 as an advance against the remaining balance of the contract price (which was approximately $1 million at that time). This payment was reflected as a "change order" on monthly invoices starting in June 2017, but Northcon CFO Erik Panke confirmed this was a mistaken characterization of the payment.

33. As Panke admitted, the invoices for the project show no change orders to the scope of work. Panke also admitted the invoices do not show Alpha agreed to increase the contract price.

34. In October 2017, Northcon issued two invoices to Alpha totaling $573,351.47 (Tr. Exs. 545-546), which caused Northcon's total billings to exceed the subcontract's ceiling price.

35. When these invoices were issued and the "scheduled value" of the contract was exceeded, Panke confirmed that Northcon's billing department unilaterally increased the "scheduled value" of the subcontract from its fixed-price of $1,848,964.54 to $2.2 million.

36. When further billings in November 2017 caused the total amount of invoices to exceed this new "scheduled value", Panke confirmed Northcon's staff again unilaterally increased the "scheduled value" of the contract to $2.7 million.

37. Alpha was not advised ahead of time of any purported change in the scope of work or any request for an increase in the ceiling price of the subcontract.

38. Alpha did not direct any extra work on the project, did not authorize any change orders, and did not agree to increase the contract price.

39. Alpha raised concerns with Northcon about the invoiced amount and the project budget, first orally and then in writing by email. (*See*, e.g., Tr. Exs. 47, 566). Okafor testified that Alpha did not receive a satisfactory response to its concerns.

40. Because Northcon's billings now exceeded the contract price and the parties had not agreed to increase the price, Alpha thereafter refused to make any further payments to Northcon for Northcon's direct work on the FamCamp project.

41. Instead, to mitigate the risk of upstream claims from subcontractors Northcon used to perform some of its work under the Alpha-Northcon subcontract, Alpha continued to make limited payments to Northcon's subcontractors as directed by Northcon. This included payments for Sonora River Electric totaling $394,765.00; payments for Jensen Precast of $15,094; and payments for Alley Carpet of $10,700.

42. Northcon has never issued a "Final Invoice" as required by the subcontract.

43. In all, Alpha paid Northcon a total sum of $2,081,398.26 for work performed under the Alpha-Northcon subcontract. (Tr. Ex. 165). This exceeded the contract price of $1,848,964.54.

44. Alpha has lost money on the project, in part because it was required to pay out-of-pocket to satisfy Northcon subcontractors and for new subcontractors to complete punch list and warranty work on the site after Northcon abandoned the unfinished job in mid-2018.

45. Some of Northcon's alleged unpaid work was submitted to the government for payment in a Request for Equitable Adjustment ("REA").

46. The original REA submitted by Ellard Comstock (Tr. Ex. 511) was rejected in its entirety by the government (Tr. Ex. 512).

47. The government's rejection provides a rebuke of Northcon's claims of project difficulties and added expense, describing Northcon's assertions as having "no merit" and its alleged additional costs as "self-inflicted." (Tr. Ex. 512).

48. The evidence at trial showed that Comstock unilaterally authorized Southwestern Construction ("Southwestern") to perform the outer loop road option that the government had not exercised. This was done without notice to the government or Alpha, and without approval or ratification of the government and Alpha.

49. Comstock also purported to give Southwestern a change order for this work even though it was covered in the scope of work under Southwestern's original contract price of $1,250,000.

50. Northcon asserts affirmative claims of Southwestern as assignee of those claims.

51. In March 2017, Alpha entered into a separate subcontract with Southwestern to perform certain work outlined in Appendix C to that subcontract for a total price of $1,250,000.

52. This subcontract included the following provisions:

8

> SECTION 2. PAYMENT. . . . [P]ayment to [Alpha] for [Southwestern's] account is an absolute condition precedent to [Alpha's] obligations to make progress or final payment to [Southwestern] under this Subcontract.
>
> SECTION 6. CHANGES IN WORK. [Southwestern] shall make no changes in the work covered by this Agreement without written direction from [Alpha]. . . . [Southwestern] shall not be compensated for any change that is made without such written direction. . . . Should [Southwestern] claim any such order or any act by [Alpha] or others would cause additional costs, or if [Southwestern] otherwise believes it is entitled for any reason to an adjustment in the Subcontract Price or Subcontract time, [Southwestern] shall submit written notice to [Alpha] with the time proscribed in the Prime Contract or within ten (10) calendar days (whichever is shorter) of said claim arising, and prior to commencing such work; otherwise, such claim shall be deemed waived.

(Tr. Ex. 17)

53. During Southwestern's work, Comstock issued an $80,000 reductive change because Southwestern failed to perform certain work under the Alpha-Southwestern subcontract related to subgrade compaction for RV pads. (Tr. Ex. 45)

54. Through Northcon General Manager Jack Daniels, Northcon purported to issue a $17,000 change order to Southwestern. (Tr. Ex. 158) This was not a change order from Alpha, and Daniels admitted he did not have any designation of authority to act on behalf of Alpha in changing its subcontract with Southwestern.

55. A second, unsigned change order was purportedly issued for $4,500, but this document is from Northcon and is not a change order given, approved, or authorized by Alpha. (Tr. Ex. 158).

56. A "proposal" submitted by Southwestern is claimed as a third change order, but this document is not indicated as a change order, is not signed, and does not reflect any agreement by Alpha to change the contract scope or price. (Tr. Ex. 161).

57. Alpha paid Southwestern a total of $1,170,000 for work on the FamCamp project, which is the full amount of the $1,250,000 contract price minus the $80,000 reductive change order imposed by Northcon.

58. There is no evidence in the record that Alpha directed Southwestern to perform additional work or that Alpha has received payment from government that is owed to Southwestern.

/ / /

/ / /

**CONCLUSIONS OF LAW**

1. The court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2. The court also has subject matter jurisdiction under 28 U.S.C. 1331 and 28 U.S.C. 1367 because the case includes a claim arising under federal law for violation of the Miller Act, 40 U.S.C. 3131 *et seq.*, and related state law claims that form part of the same case and controversy.

3. Northcon asserts its own claims directly and the claims of Southwestern as assignee.

4. To prevail on a claim for breach of contract, a plaintiff must demonstrate (1) the existence of a valid contract; (2) that plaintiff performed or was excused from performance; (3) that the defendant breached the contract; and (4) that the plaintiff sustained damages. *Calloway v. City of Reno,* 993 P.2d 1259, 1263 (Nev. 2001).

5. Northcon and Alpha are parties to a subcontract for the performance of work on the FamCamp project. The subcontract is unsigned, but the parties agree that it reflects the operative agreement between them, and evidence shows that both parties accepted and operated under the contract as if it was fully executed.

6. The court concludes that the subcontract is valid and enforceable.

7. The Alpha-Northcon subcontract is a fixed-price construction contract stating in Attachment A that Northcon would be paid a maximum amount of $1,848,964.54 for its work on the FamCamp project. This subcontract is enforceable as written under Nevada law and must be interpreted and applied according to its plain and unambiguous terms. *See Ellison v. California State Auto Ass'n,* 797 P.2d 975, 977 (Nev. 1990).

8. The evidence shows that Alpha paid Northcon a total of $2,081,398.26—more than the amount owed under the contract.

9. For Northcon to establish a breach of contract, it must show that the maximum amount of the fixed-price subcontract was somehow increased. Northcon does not make this showing.

10. Attachment A to the subcontract specifically sets a maximum contract price of $1,848,964.54 and the subcontract states in Section 4.1 that "unless this Subcontract is modified with mutual consent of both parties hereto, such costs shall not, in total, exceed any ceiling amount noted in Attachment A hereto."

11. The subcontract further states in Section 28.3 that "[t]his Subcontract may not be modified or amended except in writing, signed by both parties."

12. Here, there is no evidence showing mutual consent to increase the ceiling price of the subcontract, nor is there any writing in that regard signed by both parties.

13. Northcon claims that the contract price was increased through change orders authorized by project manager Ellard Comstock. There are no written change orders for extra work performed by Northcon and the record includes no evidence that any extra work was disclosed to Alpha or authorized by Alpha during the course of the FamCamp project.

14. Comstock was a Northcon employee who was paid directly by Northcon for his work on the project. The subcontract expressly states in Section 15.2 that Comstock maintained his status as a Northcon employee even while working as the project manager.

15. Comstock's authority to act on Alpha's behalf was circumscribed by his written designation of authority from Alpha President Gabriel Okafor stating that Comstock had "authority to perform the role of Project General Manager, including the authority to negotiate task orders and have signing authority, pursuant to corporate and my review . . . ." (Tr. Ex. 524).

16. Comstock and Northcon both knew of this limitation.

17. Despite this express limitation on his authority, there is no evidence in this case that Comstock ever submitted extra work for Okafor's review or approval.

11

18. Thus, Comstock exceeded his designation of authority and his purported authorization of the extra work cannot increase the subcontract price or otherwise bind Alpha to pay for that extra work as a matter of contract. *See Orbit Stations, Inc. v. Curtis*, 678 P.2d 1153, 1154-55 (Nev. 1984) ("Where an individual lacks actual authority to act on behalf of a principal, the individual's representation that he is an authorized agent of a principal does not, by itself, establish such authorization. A principal may be bound by an individual's representations only if the principal consents or acquiesces to the representations.").

19. Northcon drafted the subcontract and Comstock's designation of authority. Northcon was certainly aware of the limitations and express provisions governing its ability to change the contract price or authorize extra work. Northcon and its agents did not follow these provisions. Instead, it unilaterally performed hundreds of thousands of dollars of extra work and then demanded payment for that work after the fact at the completion of the FamCamp project.

20. Northcon has not substantiated its claim that Alpha directed or agreed to extra work outside the contract. To the contrary, Northcon's CFO Erik Panke admitted the labor costs that Northcon now seeks to recoup were billed by Northcon against its base contract price, a clear indication that Northcon did not consider the payment of those charges to be outside its scope of work. This is corroborated by other testimony and documentary evidence outlined above.

21. Alpha also did not waive its right to enforce the contract ceiling price by paying certain amounts to Northcon's subcontractors starting in October 2017 after Northcon exceeded the contract ceiling price. Far from exhibiting an unequivocal acquiescence to the sums billed by Northcon for its own extra work, Alpha objected to that work and the sums billed, and subsequently refused to pay Northcon for the extra work it directly performed above the contract price without authorization.

/ / /

/ / /

22. The fact that Alpha paid some of Northcon's subcontractors to prevent upstream claims for non-payment does not prove Alpha agreed to the extra work Northcon performed directly.

23. Alpha paid the full amount of the fixed-price contract, so Northcon's claim for breach of contract fails as a matter of law and Alpha is entitled to judgment on that claim.

24. Further, Northcon offers only a lump sum figure of its damages based on the difference between the billed work it claims it performed and the total payments received from Alpha.

25. Sections 4.2 and 4.4 of the subcontract provide that Northcon is not entitled to payment unless Alpha first receives payment from the government for the work.

26. Some of the billed work Northcon seeks as damages was submitted as an REA but rejected by the government and not paid.

27. Alpha is not responsible for paying Northcon in this circumstance and that portion of Northcon's alleged damages must be rejected. Northcon has done nothing to separate this non-compensable work from its other work on the project, and it is impossible now to do so.

28. Northcon has not met its burden of proof to show its proper amount of damages by a preponderance of the evidence.

29. Northcon's damages are suspect for other reasons as well. The parties agreed one person (Chris Veltema) would perform the Quality Control/Site Safety jobs, but Northcon separated the work and billed both jobs full time. Northcon also doubled-billed QC services between Veltema and Jim Downing when the testimony from Ellard Comstock was that there should be no overlap between those two individuals in their work on the project. Alpha cannot be held liable for the padded charges.

30. Northcon also seeks damages for amounts it paid other employees who were not seconded to Alpha, but this is contrary to Section 15.2 of the subcontract that requires Northcon to bear this cost under its fixed-price contract.

31. These problems fatally infect the calculation of any contract damages Northcon might recover in this case. Without proper evidence from which the court could assess appropriate damages by a preponderance of the evidence, Northcon's claim fails on this essential element.

32. On its claim for breach of the duty of good faith and fair dealing, Northcon must show that Alpha "complied with the express terms of the contract but deliberately and intentionally 'contravened the intention and spirit of the contract.'" *ProDox, LLC v. Prof'l Document Servs., Inc.*, No. 2:20-cv-02035-JAD-NJK, 2022 WL 4379190, *7 (D. Nev. Sept. 22, 2022) (quoting *Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919, 923 (Nev. 1991) (internal brackets omitted)).

33. The duty of good faith and fair dealing cannot be used to "increase the legal obligations of the parties when the parties have intentionally limited such obligations." *Griffin v. Old Republic Ins. Co.*, 133 P.3d 251, 254 (Nev. 2006). Stated differently, "an implied covenant of good faith and fair dealing cannot contradict the terms of the contract from which it stems." *Chavez v. California Reconveyance Co.*, No. 2:10-cv-00325-RLH-LRL, 2010 WL 254006, *4 (D. Nev. June 18, 2010).

34. As indicated above, Northcon received the expected benefit of the fixed-price subcontract when it was paid the full amount of that contract.

35. The subcontract included specific provisions to increase the contract amount, which Northcon did not follow. Having elected to perform extra work without changing the amount of the fixed-price subcontract, Northcon cannot now characterize Alpha's refusal to pay for the extra work as a breach of the duty of good faith and fair dealing.

36. Generally, Nevada law is clear that quantum meruit recovery is not permitted when the parties have an express contract covering the matter. *See Leasepartners Corp. v. Robert L. Brooks Trust dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997) ("An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement."); *Ewing v. Sargent*, 482 P.2d 819, 823 (Nev. 1971) ("Numerous authorities

14

tend to support respondent's view that an action does not lie on an implied contract where there exists between the parties an express contract covering the same subject matter."); *see also Mobius Connections Grp., Inc. v. Techskills, LLC*, No. 2:10-cv-01678-GMN-RJJ, 2012 WL 194434, *8 (D. Nev. Jan. 23, 2012) ("Nevada treats quantum meruit claims and unjust enrichment claims very similar. If there is no express agreement as to compensation, then one can recover the reasonable value of their services under a quantum meruit claim.").

37. That general rule applies here—Alpha and Northcon had a written subcontract governing the work on the FamCamp project, which set an all-in price Northcon would be paid for its work on that project. With this express agreement covering the parties' relationship and the payment Northcon would receive for its work, a quantum meruit claim fails as a matter of law. *See Ewing*, 482 P.2d at 823 ("It is one thing to imply an agreement to pay for valuable goods or services rendered in anticipation of compensation when an express agreement defining compensation cannot be found or is uncertain as to the exact terms of payment; it is quite another thing to imply an agreement for payment beyond that apparently bargained for by the parties.").

38. The circumstances of this case are different from cases in which Nevada courts have allowed quantum meruit claims to proceed despite a written contract when the contract was deemed to have been abandoned or when the party seeking equitable recovery was specifically directed to perform work outside the contract. *See, e.g., J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019-1021 (Nev. 2004) (discussing abandonment and cardinal change doctrines as grounds for recovering on quantum meruit); *Udevco, Inc. v. Wagner*, 678 P.2d 679, 682 (Nev. 1984) (discussing quantum meruit recovery when contractor performed extra work at the direction the other party to the contract).

39. Here, the Alpha-Northcon subcontract was not abandoned and Northcon was never directed by Alpha to perform extra work outside the contract. Instead, Northcon continued operating under the subcontract but took it upon itself to perform extra work on

the FamCamp project without disclosing that extra work to Alpha and only billing Alpha for that extra work after the fact. These circumstances do not support an exception to the normal rule that Northcon is not permitted to recover on a theory of quantum meruit when an express contract already governs the parties' relationship on the FamCamp project.

40. This quantum meruit claim also fails for lack of evidence on the reasonable value of services Northcon preformed. The amount Northcon billed for the work at issue does not automatically establish its reasonable value. *See Las Vegas Sands Corp. v. Suen*, No. 64594, 2016 Nev. Unpub. LEXIS 580, *13 (Nev. July 22, 2016) ("The contract price and the reasonable value of services rendered are two separate things, and although the contract price may accurately capture the reasonable value of services rendered, it may also depart from it substantially." (internal quotations and brackets omitted)). At trial, the court rejected Northcon's effort to offer evidence of value through Erik Panke for lack of foundation, and Northcon never attempted to offer other evidence on the subject.

41. As the record stands, Northcon has no evidence to support its recovery on the claim for quantum meruit. Judgment is appropriate for Alpha on this claim.

42. To prevail on a Miller Act claim, Northcon must prove that (1) it provided materials and labor in furtherance of work authorized by a subcontract; (2) it has not been paid; (3) it had a good faith belief that its materials and labor were intended for the contracted work, and (4) that all other jurisdiction requirements are met. *United States ex rel. Hawaiian Rock Prods. Corp. v. A.E. Lopez Enters., Ltd.*, 74 F.3d 972, 975 (9th Cir. 1996).

43. Northcon's Miller Act claim fails because it cannot show it performed authorized work under the subcontract for which it has not been paid. To the contrary, the evidence shows that Northcon has been fully compensated on the fixed-price subcontract with Alpha.

44. This claim fails as a matter of law under the circumstances.

45. The claims Northcon asserts as assignee of Southwestern are essentially the same as the claims Northcon asserts directly. These claims fail as a matter of law for the same reasons that Northcon's direct claims fail, as discussed above.

46. Northcon claims Alpha has failed to pay amounts due for extra work performed by Southwestern under its subcontract with Alpha. But the subcontract has specific rules for change orders that were not followed in this case.

47. Two written change orders for Southwestern's extra work were made by Northcon, but there is no evidence in the record that Alpha reviewed or approved these change orders. The first change order is signed by Jack Daniels, who lacked authority to change Alpha's subcontract with Southwestern, and the second change order also comes from Northcon and is unsigned.

48. The third, unwritten change order is even more problematic because there is no written record of the process used to implement the purported change order, let alone any indication that Alpha reviewed or approved it.

49. Northcon enforced an $80,000 reductive change order against Southwestern's contract that reduced the price of the Alpha-Southwestern subcontract to $1,170,000.

50. Alpha paid that full amount, so there is no breach of contract on the facts of this case.

51. Alpha is entitled to judgment as a matter of law on this claim.

52. Southwestern's subcontract has a pay-when-paid provision in Section 2.

53. The evidence is clear that all of Southwestern's extra work was submitted to the government for payment under either the REA or a separate claim for quantum meruit, but there is no evidence the government has paid any of that work, so Northcon cannot prove that damages for the work are owed by Alpha.

54. The evidence also shows that much of the so-called "extra" work Southwestern performed on the outer loop road was actually included with the scope of work in the original subcontract (identified as "option 1"). Under the circumstances, this work cannot be compensated above the base price of contract, which is already satisfied.

55. As calculated, Northcon's claim that Southwestern is owed the full amount of its original contract price results in duplication of Northcon's own damages, which include the work Northcon performed to cover Southwestern. For this work, Northcon issued an $80,000 back charge to Southwestern to reduce Southwestern's contract price from $1,250,000 to $1,170,000. Northcon cannot simultaneously claim entitlement to same $80,000 in damages for itself and Southwestern. Northcon CFO Erik Panke admitted on the stand that this is double-dipping.

56. These problems with Southwestern's calculations prevent the court from finding by a preponderance of the evidence that Southwestern is entitled to any damages on its contract claim.

57. As with Northcon's own claim, it has not articulated any viable claim for breach of the duty of good faith and fair dealing on Southwestern's subcontract because Alpha was rightfully entitled to deny payment on sums that exceeded the subcontract price when Southwestern failed to comply with the express provisions for increasing the subcontract price.

58. Alpha is entitled to judgment as a matter of law on this claim.

59. Again, Southwestern's quantum meruit claim fails for the same reasons as Northcon's claim discussed above. Alpha and Southwestern had an express contract governing their relationship on the FamCamp project and Southwestern's right to payment for work performed on that contract. There is no evidence in this case that the subcontract was abandoned or that Alpha directed Southwestern to perform work outside the contract that might otherwise be compensated under a quantum meruit theory.

60. Alpha is entitled to judgment as a matter of law on this claim.

61. In addition, Northcon's own evidence proves it cannot establish the reasonable value of Southwestern's work—all three witnesses involved in that work (Jack Daniels, Ellard Comstock, and Steve Thurston) disagreed about the value of work subject to the back charge. Under these circumstances, the court lacks substantial evidence to assess and award quantum meruit relief.

62. As with Northcon's claim, because Southwestern cannot show it performed authorized work for which it has not been paid, its claim under the Miller Act also fails as a matter of law.

63. Alpha's subcontracts with Northcon and Southwestern allow a prevailing party to recover reasonable attorneys' fees. (*See* Tr. Ex. 20 at 12, Section 28.7; Tr. Ex. 17 at 5, Section 13).

64.  Alpha and ACIC are the prevailing parties here.

65. The court finds that they should be awarded their reasonable attorneys' fees incurred in defending the claims of Northcon and Southwestern. Within seven days from the date of this order, the parties shall meet and confer in an attempt to reach agreement on the amount of fees to be paid. If the parties cannot reach agreement, Alpha and ACIC shall file motions for attorneys' fees no later than 14 days from the date of this order. Northcon will then have seven days to respond, and Alpha and ACIC will have seven days to file a reply.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, consistent with these findings and conclusions, judgement shall be entered in favor of Alpha and ACIC on all claims.

IT IS FURTHER ORDERED that Alpha shall prepare and file a proposed judgment consistent with the forgoing findings and conclusions within fourteen (14) days of the issuance of this order.

DATED THIS 4th day of November 2022.

JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE